### SARAH M. LANPHIER
*v.*
### THOMAS S. DESMOND.

*Opinion filed October 19, 1900.*

1. MORTGAGES—*trust deed has no force until delivery, though recorded.* A trust deed, although duly executed, acknowledged and recorded, has no force as a conveyance until it has been delivered.

2. SAME—*encumbrancer is bound by record of conveyances prior to delivery of mortgage.* One who receives a trust deed from the grantor therein is bound by the record of conveyances in such grantor's apparent chain of title, and hence takes subject to a conveyance of the property by warranty deed recorded after the trust deed was recorded but before it was delivered.

3. SAME—*effect of payment of debt collaterally secured by a trust deed.* Upon the payment, by the grantor in a recorded trust deed, of the debt for which such deed and the note purporting to be secured thereby were held as collateral, and the return of the deed and note to him, the lien of such deed is extinguished as against one to whom the grantor, prior to such payment, had conveyed his interest in the property by a recorded deed of warranty.

*Desmond* v. *Lanphier,* 86 Ill. App. 101, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

PECK, MILLER & STARR, for appellant.

CHYTRAUS & DENEEN, CHARLES H. HAMILL, and ED-WIN WHITE MOORE, for appellee.

Per CURIAM: The following statement of the case was made and opinion rendered by the Appellate Court:

"Appellee, Sarah M. Lanphier, claiming to be the owner of a note of $3500, dated August 20, 1888, made by Reuel W. Bridge, payable to his order and by him endorsed, due one year after date, and secured by a trust deed of the same date made by said Bridge and wife to James Mor-

gan, trustee, and Charles Morgan, as successor in trust, conveying eighteen lots in Cheltenham, Cook county, Illinois, and which was recorded September 25, 1888, filed her bill in the circuit court of Cook county on March 20, 1897, against Thomas S. Desmond, said Bridge and others, to foreclose said trust deed because of the alleged non-payment of a balance claimed to be due on said note of $2100 and interest. No defense was made by any of the defendants, although they answered the bill, except Desmond, who answered, in substance denying that Bridge was indebted in any amount on said note; that it was made to evidence or secure any *bona fide* indebtedness existing at the time it was made; that said note was at any time delivered to said Lanphier, and alleging that if it was delivered to her it was not so delivered until long after the maturity thereof and after Desmond had become the owner of the real estate described in the trust deed. The answer admits the execution and recording of the trust deed, but alleges that there was no consideration therefor, and denies that the trust deed was at any time prior to the maturity of the note delivered to any *bona fide* holder, and denies that it ever became effective as a lien as against said Desmond. The answer also admits the charge in the bill that he, said Desmond, has an interest in said real estate, and alleges that he is the owner thereof in fee simple, and that the same is not subject to the lien of said trust deed. Replications to the answers were filed. Desmond also filed a cross-bill against said Lanphier and the other defendants to the original bill, in which is alleged, in substance, the same matters set up in his answer, and the details as to how he became the owner of the premises in question, and praying that said trust deed be decreed to be surrendered and canceled and declared not to be a valid or existing lien on said premises. The defendants to said cross-bill answered the same, to which replications were filed and the cause referred to a master to take proof and report

his conclusions. The master reported, recommending a decree of foreclosure of said trust deed for the amount found by him to be due thereon, viz., $3703, and that the cross-bill of said Desmond be dismissed for want of equity. Objections were filed to the master's report by said Desmond, which were ordered to stand as exceptions thereto, and upon a hearing before the chancellor the master's report was confirmed and a decree of sale of the real estate in question, except of three lots released by the trustee, hereinafter referred to, was entered for the amount found due by the master, but no disposition is made in the decree of the cross-bill of Desmond.

"It appears from the record that after the filing of the master's report and objections thereto, and on the 16th day of December, 1898, counsel for said Desmond moved the court for leave to dismiss his cross-bill, which motion was continued. Afterwards, and on the same day of the entry of the decree of foreclosure, the following separate order was entered by the court, viz.: 'On motion of solicitor it is ordered that the cross-bill of Thomas S. Desmond is hereby dismissed out of this court at the cost of cross-complainant.' The appeal in this case is prosecuted by Desmond from the decree of foreclosure, and none of the other parties to the litigation, except said Lanphier, have appeared in this court.

"From the evidence reported by the master the following facts, in substance, appear, to-wit: In March, 1884, by an agreement between one Bartow A. Ulrich and said Bridge, the latter took the legal title of certain real estate, including the premises in question, in trust, upon the understanding that said Ulrich should receive one-half of the final profits which might result in dealing in said real estate and the said Bridge the other half of such profits. In March, 1884, and after Bridge took said title, and as a part of the same transaction, Ulrich sold one-half of his interest in the profits to be derived from said real estate to Desmond, for which the latter gave to

Ulrich a note of the Franklin Printing Company of $3000, dated December 19, 1883, payable to the order of Desmond in one year, and by him endorsed, the note being executed by Desmond as president of the printing company, and also by the secretary of the company. This note was immediately transferred by Ulrich to Bridge in consideration of Bridge conveying a quarter interest in the profits of said real estate to Victoria Ulrich, a daughter of said Bartow A. Ulrich, and a further payment of $1500 by said Bridge to said Bartow A. Ulrich. Said note of the printing company was also secured by a chattel mortgage of that company on certain personal property. As the result of this transaction Bridge held the title in fee simple of said real estate in trust, to pay the profits arising from dealing therein, one-quarter to each Bartow A. Ulrich, Victoria Ulrich, said Desmond, and to retain one-quarter for himself.

"When said printing company note became due it was owned by Bridge, who, by agreement with Desmond, renewed it by a new note of the printing company dated December 19, 1884, payable to the order of Desmond on June 19, 1885, and endorsed and guaranteed by Desmond. As collateral to this last note Desmond also made and delivered to Bridge his individual note dated December 18, 1884, for $2000, payable to Bridge, one-half on March 1, 1885, and the balance on April 1, 1885, with interest at eight per cent. per annum, to secure which Desmond also made and delivered to Bridge a chattel mortgage of the same date, conveying two buildings on leased ground. No payment was ever made by Desmond to Bridge upon this note of $2000 or to any one else, nor has he ever been asked to make any payment thereon. Bridge claims to be still the owner of the note and mortgage, but that they have been lost or misplaced. They were not produced on the hearing.

"When the note of the printing company which became due June 19, 1885, matured, Bridge took a third

note of the printing company, executed by Desmond as president and C. E. Page as secretary, for the sum of $3000, dated June 19, 1885, payable to the order of Bridge, $1000 in three months, $1000 in six months, $900 in nine months and $100 in twelve months, respectively, after date, with interest at eight per cent per annum, payable quarter-yearly, and providing that default in any installment should mature the whole note, if the holder should so elect. This last note was also secured by a chattel mortgage of the printing company to Bridge, and is endorsed with divers payments of interest up to March 19, 1886, and payments of principal of $765 and $204.34, stated to be proceeds of sale of property covered by the mortgage, and a further endorsement as follows: 'Amount due as of June 9, 1886, $2074.47.'

"August 20, 1888, Bridge made his note for the sum of $3500 of that date, payable one year thereafter, to his own order, and endorsed by him, bearing interest at seven per cent until maturity and eight per cent after maturity, and to secure the same he, together with his wife, made and acknowledged a trust deed of the same date, conveying to James Morgan, as trustee, eighteen lots, being part of the property so held in trust by him. This trust deed was recorded September 25, 1888. At divers times thereafter Bridge used this note and trust deed as collateral to secure loans of money and indebtedness by him to divers persons, all of which loans he paid, and after the payment of each the note and trust deed were returned to him. This note and trust deed were in his possession in the month of May, 1894, and did not, at that time, secure any loan to Bridge or indebtedness by him or by any one else. The note is endorsed with two payments,—one of $500, July 20, 1889, and one of $900, December 31, 1889,—and also shows endorsements of interest paid thereon up to January 1, 1891, and extensions of payments thereon from time to time to January 1, 1891.

"February 9, 1889, there was executed by the said Ul-
rich, his daughter and Desmond, a statement in writing
purporting to show the final profits and interest of each
of the parties in said real estate held by Bridge in trust.
This statement recites that the share of Desmond in said
profits was $4718.63, and that he was entitled to have
conveyed to him such parts of said real estate clear of
encumbrance, subject to taxes and assessments of 1888,
as he might select, at the schedule prices of the real es-
tate fixed by said statement, up to the amount of said
profits coming to him. Bridge endorsed thereon his writ-
ten assent to this statement, and thereby agreed on his
part, as trustee and individually, to carry it out, except
as to certain lots not now in question, which had been
sold. Thereafter, on February 18, 1889, Desmond notified
Bridge, in writing, that he had selected eighteen lots, the
total value of which, at the schedule prices by said state-
ment, amounted to $4500, and demanded of Bridge a con-
veyance thereof according to his agreement, and that
he pay the balance of Desmond's share of said profits,
to-wit, $218.63, in cash. The lots so selected by Desmond
were the same lots conveyed by Bridge in the trust deed
to Morgan of August 20, 1888.

"Thereafter, on March 21, 1889, in compliance with the
demand of Desmond, Bridge and wife made and delivered
to Desmond a deed of conveyance of the lots so selected
by Desmond. This deed is made out upon a printed form
of deed commonly known as the statutory form of quit-
claim deed which is described in the Revised Statutes of
Illinois concerning conveyances. In the deed from Bridge
to Desmond the printed word 'quit-claim' was erased with
a pen and the word 'warrant' written over it in the hand-
writing of Bridge, so that the deed as executed, acknowl-
edged and delivered read, that the grantors (naming
them) 'convey and warrant' to Thomas S. Desmond 'all
interest in the following described real estate' (describ-

ing the same). This deed was recorded March 23, 1889. At the same time this deed was made, Bridge and Desmond signed an agreement which recited, in substance, that said deed was delivered in full settlement and discharge of all claims and demands of Desmond against Bridge in any way connected with or arising out of the real estate named in said agreement of February 9, 1889, as far as said Desmond was concerned; that there was 'still due from Bridge to Desmond $218.64,—a money claim which, with the claim of said Bridge against said Desmond for balance of indebtedness arising out of the Franklin Printing Company debt, are to be settled hereafter.'

"On the hearing, Bridge testified, when asked why the word 'quit-claim' was stricken out of the deed and the word 'warrant' inserted in its place, that he did it to warrant the interest which he had on the day that he drew or made the deed. Desmond testified that when he received the deed he supposed that the land was free and clear from all encumbrances, and did not know of the existence of the trust deed to Morgan until a month or more after he had received his deed from Bridge, and that after he found out about the trust deed, at his request Bridge made the payment of $500, which was endorsed upon the note secured thereby, under date of July 20, 1889, by means of which Bridge secured a release from the trustee of three of the lots, which release was delivered to Desmond. This release contained the following clause, viz.: 'This release in nowise to affect or lessen the lien of the said trust deed on the balance of the property thereby conveyed.'

"Commencing in the year 1884, and continuing up to the latter part of 1895, the appellee placed in Bridge's hands different sums of money from time to time, to be loaned by him as her agent. The amount so placed with him by appellee, together with accruing interest, after making all deductions to which Bridge was entitled, was,

on October 10, 1895, $7213.65.   Appellee kept a box in Bridge's office, where, it seems, he was in the habit of placing her securities for money which he loaned for her, but she never looked among the papers to see what the securities were until the latter part of 1895.   Bridge testifies that in May, 1894, when he was indebted to appellee more than the sum of $2100 and the accrued interest upon the note secured by the Morgan trust deed of August 20, 1888, he placed said trust deed and the note secured thereby in appellee's box of securities then in his office, and for the purpose of transferring them to her as a security for his debt then owing her.   Appellee testified that she never saw the note and trust deed prior to December, 1895; that she could not tell when she first obtained them; that the first actual knowledge she had of them was in the latter part of 1895, and that they were placed in her box without her knowledge.   She also testified that she never loaned Bridge any money; that she left her money with him in small or large amounts; that he was to collect the interest and let it go as principal, and that she did not collect the interest.   This note, so placed by Bridge among appellee's securities, had matured more than three years prior to that time.   Appellee parted with no right or claim which she had against Bridge, nor did she pay any money for the note and trust deed.   The property secured by the trust deed was vacant and unoccupied at the time of the making and recording of the deed from Bridge to Desmond, and also in 1894, when the note and trust deed were placed in appellee's box of securities by Bridge, and also in 1895, when appellee first had knowledge of the same."

Opinion:

"From the statement preceding this opinion it appears that at the time (May, 1894,) the trust deed to foreclose which appellee filed her bill was acquired by her, there was no existing *bona fide* debt of its maker, Bridge, or of any one else, secured by it.   It, and the note purporting

to be secured thereby, had previous to that time, on different occasions, been used by Bridge as collateral to secure divers claims owing by him, but when it passed into the hands of appellee the transfer was from Bridge, and not from any one with whom he had hypothecated them or from any *bona fide* owner or holder, then, and not till then, as to appellee, could the trust deed take effect. That was the time of its delivery. It then for the first time, in favor of appellee, became an existing encumbrance upon the real estate conveyed by it, and as to her had the same effect and validity, and no other, than if Bridge on that day had made a new trust deed and note for the same amount and delivered them to her. No deed is complete without delivery. 1 Jones on Mortgages, secs. 84, 539; 2 id. sec. 948; *Partridge* v. *Chapman*, 81 Ill. 137; *Weber* v. *Christen*, 121 id. 91; *Sullivan* v. *Eddy*, 154 id. 199; *Skinner* v. *Baker*, 79 id. 496; *Schultze* v. *Houfes*, 96 id. 335; *Herber* v. *Thompson*, 47 La. Ann. 803; *Underhill* v. *Atwater*, 22 N. J. Eq. 21; *Purser* v. *Anderson*, 4 Edw. Ch. (N. Y.) 18; *Spencer* v. *Fredendall*, 15 Wis. 736.

"Mr. Jones, in section 84, *supra*, says: 'Without delivery there is no mortgage. It takes effect only from the time of its delivery.' In section 539 the same author says: 'Delivery is another incident necessary to giving effect to the mortgage, even as between the parties to it. Although the deed be recorded, if it has not been delivered, or the delivery was unauthorized, a subsequent conveyance by the mortgagor or a subsequent judgment against him will take precedence.' Section 948 the author says: 'The condition of a mortgage having been performed, a subsequent encumbrancer has the right to avail himself of the advantage, and not to be postponed to equities newly created, which, in fact, are subsequent to his own claim.' In the same section the author also says that when the original debt for which a mortgage has been given has been satisfied, 'the original mortgage cannot, as against third persons especially, be dealt with

as a subsisting security.'   The authorities cited by the author in support of these propositions sustain him.

"In the *Partridge case, supra,* the Supreme Court held with regard to a mortgage which was executed by the owner of real estate to a person who was not present by himself or agent, and left the same for record, with directions, when recorded, to be sent to the mortgagee by mail, which was done, there was no delivery until it was mailed, and that a subsequent purchaser who took actual possession before the mortgage was delivered took a title superior to the mortgage.

"In the *Weber case, supra,* it was held that the acknowledging and recording of a deed without the knowledge or consent of the grantee did not amount to a delivery. To the same effect is the *Sullivan case, supra.*

"In the *Skinner case, supra,* the court says: 'Delivery is an essential and indispensable element to the conveyance of the lands by deed, for the reason that a deed takes effect only from the delivery.'

"In the *Underhill case, supra,* the New Jersey court holds that a 'mortgagor may again issue or negotiate a mortgage which has been satisfied, paid off or delivered to him, except as against intervening securities.   The delivery of any instrument by the grantor gives it efficacy, and if he takes a paper executed and once used for another purpose, its re-delivery gives it again vitality.'

"In the *Schultze case, supra,* it was held that the lien of a trust deed, though recorded, takes effect only from the time the money is in fact received, as against the equities of a third person under a prior unrecorded mortgage or trust deed; that it made no difference that the intention was that upon the payment of the money the title should relate back to the time of the recording of the deed, and that while such an intention, as between the parties themselves, might be carried out by the court, when the rights of third persons intervene the intention of the parties must yield to the law.

"In the *Purser case, supra,* it was held that a mortgage which had been paid could, for a valuable consideration, be kept alive for other purposes, but not as against the rights of creditors or third persons which had intervened. This ruling was made with reference to a second mortgage by the same mortgagor and an assignment for the benefit of creditors.

"In the *Spencer case, supra,* the Supreme Court of Wisconsin held that a husband could not keep alive, for the purpose of securing a new debt, as against his wife, a mortgage on the homestead which had been paid, because it was, in effect, making a new mortgage, and could not be valid, under the statute regarding homesteads, without the signature of the wife.

"Long prior to the time appellee acquired this trust deed and note, and on March 21, 1889, Bridge had conveyed and warranted to appellant all his (Bridge's) interest in the real estate in question, which was the legal title subject to the lien of this trust deed then outstanding in the hands of one of Bridge's creditors. This conveyance passed Bridge's title to appellant, was recorded in the recorder's office of Cook county on March 23, 1889, and was, therefore, under the recording laws of this State, notice to all subsequent purchasers or encumbrancers claiming through Bridge. Hurd's Stat. 1897, chap. 20, sec. 21; *Kerfoot* v. *Cronin,* 105 Ill. 609; *Willoughby* v. *Lawrence,* 116 id. 11; *Schultze* v. *Houfes,* 96 id. 335; *Cunningham* v. *Thornton,* 28 Ill. App. 58, and cases cited.

"The title having passed from Bridge to appellant, Bridge had none to convey, and could convey no title in May, 1894, when he turned over to appellee the old trust deed, which then, the time of its delivery to her, became, as between her and Bridge, a valid and existing deed. As to appellant, when this trust deed came back into the hands of Bridge, the debt for which it was a security having been extinguished by him, it became a nullity in equity—was the same as if it had never been made.

Appellant's deed then being of record, took precedence of all instruments or conveyances purporting to affect the title of the real estate conveyed by it which could be made by Bridge. As we have seen, the old trust deed could have no greater force or effect than if it had been signed on the day it was delivered to appellee. That the recording of a document which had no existence as a deed could give it no validity as a deed is elementary.

"These facts, in our opinion, are controlling and conclusive in the decision of this case, and all other matters shown by the record are either immaterial or of no consequence, as are also the various contentions of the learned counsel in their arguments as to the law and facts governing the case. Except as hereinafter referred to, we deem it unnecessary to mention specifically the numerous points made by appellee's counsel in support of the decree.

"It is claimed for appellee,—and several cases are cited to support the contention,—that she is not required to take notice of the registry of the deed by Bridge to appellant, it being recorded subsequent to the date of record of the trust deed in question. An examination of the several cases cited (including *Miller* v. *Larned*, 103 Ill. 562, which seems to be principally relied on,) shows that the facts and questions to be decided by the court in these cases were wholly different from the case at bar. These cases, because of the difference in their facts, are not applicable to the case of a trust deed which, like the one here in question, first had its existence, as between appellee and Bridge, long after the record of the deed from Bridge to appellant, and for which appellee parted with no right and paid no consideration. The registry laws have application to subsequent purchasers and encumbrancers. Appellee is an encumbrancer, and, in a sense, a purchaser subsequent to the record of appellant's deed. She is bound by the record of conveyances in the apparent chain of title from the grantor in her trust deed. The

deed to appellant being of record, is as much a notice of his title, as against Bridge, as if appellant had been in possession of the lots when the trust deed was transferred to her. 1 Jones on Mortgages, secs. 458, 710; *Schultze, Kerfoot and Cunningham cases, supra.*

"It is further claimed that appellant, by obtaining the release from Bridge of certain lots covered by the trust deed, which release stated that it should in nowise affeçt the lien of the trust deed on the remainder of the property thereby conveyed, acknowledged the validity of the trust deed and cannot now be heard to deny its validity. The trust deed was then outstanding as security of a debt due by Bridge, and was a lien which appellant could not then question as against Bridge's then creditor, who was secured by it. When Bridge extinguished the debt, as he afterwards did, that was the end of the lien of the trust deed as to appellant.

"It is also claimed that the dismissal of appellant's cross-bill, not purporting to be without prejudice, is therefore, for want of equity, *res judicata* and a bar. We think a consideration of the whole record shows that the dismissal was the voluntary act of appellant at a time when he had a perfect right to dismiss his cross-bill without the consent of the defendants thereto, and is in no way an adjudication against appellant. The Chancery act (sec. 36, chap. 22, Rev. Stat.) has no application to this case.

"The decree of the circuit court is reversed and the cause remanded, with directions to enter a decree dismissing appellee's bill for want of equity, at her costs. She will also pay all costs in this court."

The foregoing opinion by Mr. Justice WINDES, showing the just grounds upon which the judgment in the case should be based, is adopted as the opinion of this court.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*